**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| TERENCE POWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **Cause No. 1:13-CV-51** |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff appeals to the district court from a final decision of the Commissioner of Social

Security ("Commissioner") denying his application under the Social Security Act (the "Act") for

a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be

REVERSED, and the case will be REMANDED for further proceedings in accordance with this

Opinion.

## I. PROCEDURAL HISTORY

Powell initially applied for SSI and DIB in October 2007, alleging that he became

disabled on June 3, 1972. (Tr. 281-88.) Powell was last insured for DIB on June 30, 2008;

therefore, with respect to his DIB application, he must establish that he was disabled as of that

date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant

must establish that he was disabled as of his date last insured in order to recover DIB benefits).

After an administrative hearing, an administrative law judge rendered an unfavorable

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

decision to Powell on January 26, 2010, and the Appeals Council denied his request for review. (Tr. 118-31, 219-23.) Powell appealed the denial to this Court; ultimately, the case was reversed and remanded for a new hearing because the hearing tape contained too much inaudible testimony. (Tr. 153-56.)

On March 21, 2011, before a ruling was issued by the Court on his appeal, Powell filed new applications for DIB and SSI, which were then consolidated with his prior application. (Tr. 19, 252-53.) The Commissioner denied his application initially and upon reconsideration, and Powell requested an administrative hearing. (Tr. 226-50.) On March 16, 2012, a hearing was conducted by Administrative Law Judge Warnecke Miller (the "ALJ"), at which Powell (who was represented by counsel) and Marie Kieffer, a vocational expert ("VE"), testified (Tr. 54-110); Powell then amended his alleged onset date to September 25, 2007 (Tr. 343-47).

On June 14, 2012, the ALJ rendered an unfavorable decision to Powell, concluding that he was not disabled because his substance use disorder was a contributing factor material to the determination of disability, and he would not be disabled if he stopped the substance use. (Tr. 19-43.) The Appeals Council denied Powell's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-9, 199-223.)

Powell filed a complaint with this Court on February 22, 2013, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Powell contends that the ALJ: (1) improperly evaluated the April 2012 medical source statement drafted by Ms. Karen Lothamer, his treating psychiatric nurse practitioner, and countersigned by Dr. Vijay Varma, a psychiatrist; (2) improperly evaluated the drug addiction aspects of the case; and (3) lacked a proper foundation for the number of jobs cited in her step five finding. (Opening Br. of Pl. in Social

Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 18-25.)

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Powell was forty-five years old (Tr. 348), had a high school education and taken some college classes (Tr. 63, 383), and possessed relevant work experience as a material handler, polish/buffer, hand packager, and forklift driver (Tr. 31, 533). Powell alleges that he became disabled on September 25, 2007, due to bipolar I disorder most recent episode depressed, severe with psychotic features; personality disorder; osteoarthritis; anterior cruciate ligament ("ACL") tear of the left knee; hypertension; disorders of the spine; obesity; and diabetes mellitus. (Opening Br. 2.) Because Powell challenges only the ALJ's findings concerning his mental impairments, the Court will focus on the evidence pertaining to his mental, rather than physical, limitations.

At the hearing, Powell testified that because he hears voices in his head, he has a hard time dealing with people and prefers to stay at home where he feels safe. (Tr. 87.) He spends most of his time watching television. (Tr. 75-77, 87.) He does go to the grocery, but only for a brief period before he feels the need to leave. (Tr. 79-80.) Powell lives with a friend, and although they occasionally eat and watch television together, their contact is otherwise limited. (Tr. 75-79.) Socially, Powell talks with his mother daily by telephone, visits with his neighbor on a frequent basis, and infrequently talks with his daughter by telephone. (Tr. 80-82, 84-85.) Powell testified that he cannot keep jobs because of his problems with supervisors; he does not like being confronted while trying to work. (Tr. 72, 88-91.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 1,283-page administrative record necessary to the decision.

Powell stated that he used cocaine from the time he was nineteen until he was thirty to thirty-five (which is between 1997 and 2002), and had a relapse in 2003 or 2004. (Tr. 82-83, 85.) He reported that he used marijuana on a daily basis, but stopped in 2000 (Tr. 86); he testified that he has not used drugs since his alleged onset date (Tr. 83).

## B. Medical Evidence

In December 2006, Powell was evaluated by Danielle Wardell, a clinician at Park Center, due to increasing anger issues. (Tr. 599-604.) She reported that Powell was overwhelmed by symptoms of distress including delusions (asserting that there is a chip inside his head enabling others to control and manipulate him), drug use, and hallucinations (claiming that he hears voices inside his head that tell him to use drugs); and that these symptoms leave him unable to attend to work, housing, and his relationships. (Tr. 599.) Powell reported using crack within the past month, and his girlfriend said that he had used crack every day during the preceding month. (Tr. 599.) Powell stated that his psychotic symptoms started about fifteen years ago before he started using drugs; Ms. Wardell, however, observed that there was no mention of psychotic-like symptoms in his prior Park Center records. (Tr. 602.) She noted Powell's extensive drug history and found him indifferent to treatment due to his delusions, religious thinking pattern, and paranoia. (Tr. 599-602.) She assigned him a Global Assessment of Functioning ("GAF") score of 35 and diagnoses of cocaine dependence and cocaine-induced psychotic disorder with delusions and hallucinations, and rule-out schizophrenia, paranoid type.[3] (Tr. 603.)

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id.* A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)

The following month, Dr. Nilda Salazar, a psychiatrist, performed a clinical assessment at Park Center. (Tr. 597-98.) Powell reported a long history of drug use, with cocaine being his preferred drug; that drugs help him relax; that he believes there is a chip implanted in his head; and that he hears voices inside his head. (Tr. 597.) Dr. Salazar diagnosed him with a substance-induced psychotic disorder, cocaine dependence, cannabis dependence, and personality disorder not otherwise specified ("NOS"); she assigned him a GAF of 65 and advised him to reconsider his drug use, which was leading to auditory hallucinations and paranoia. (Tr. 598.)

In November 2007, James White, a clinician at Park Center, evaluated Powell. (Tr. 705-09.) Mr. White reported that Powell denied having problems, refused assistance, was incoherent and delusional, had suspicious and blaming thought content, and was experiencing hallucinations. (Tr. 705.) Mr. White indicated that Powell had interpersonal conflicts at home, work, and in the community; was talking abusively to others; felt isolated from his family and friends; and had difficulty maintaining relationships with others. (Tr. 706.) Powell was assigned a GAF of 35 and diagnoses of amphetamine-induced mood disorder, cocaine dependence, cannabis dependence, and personality disorder NOS. (Tr. 707.)

That same month, Ms. Lothamer, a psychiatric nurse practitioner, conducted a mental status exam and found Powell had distractible behavior, a detached attitude, irritable mood, flat affect, coherent thought form, delusional and blaming thought content, and heard voices. (Tr. 739-40.) Ms. Lothamer, or occasionally one of her peers, conducted mental status exams on

---

or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*. And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id*.

Powell on a nearly monthly basis from April 2007 to October 2011. (Tr. 606-11, 739-41, 746-49, 754-56, 765-67, 795-98, 800-13, 827-32, 836-40, 926-29, 942-45, 990-94, 1008-12, 1032-36, 1041-45, 1053-57, 1074-82, 1150-54, 1228-37, 1253-57.)  The exams typically lasted fifteen to thirty minutes, were related to Powell's medication management, and were approved by Dr. Varma, a psychiatrist, or one of his peers. (*See, e.g.*, 746-49.)  Because most of the mental status exams contain similar information–for example, that Powell was irritable, had a flat affect, had delusions in thought content, and agitated behavior–this Opinion only recounts the remarkable portions.

In December 2007, Mr. White performed a psychiatric status review (countersigned by Dr. R. Mumtaz) at the request of Social Security. (Tr. 649-55.)  Powell was assigned a GAF of 50 and diagnoses of bipolar disorder most recent episode depressed, severe with psychotic features; intermittent explosive disorder; and personality disorder NOS. (Tr. 649.)  Powell reported a history of physical, emotional, and sexual abuse growing up; little interest in other people; and that he had used drugs as a way of coping with stress, but had stopped using in 1999. (Tr. 651.)  His behavior was appropriate, but at times he appeared agitated; insight and judgment were fair to poor; mood was depressed and angry; and thought content was blaming with a hopeless or worthless theme. (Tr. 651.)  Powell stated that he has a hard time focusing while reading; his mind constantly wanders; and although he does not have any problems relating to others, he chooses to limit his social interactions. (Tr. 653-54.)  He also reported that he has problems taking instructions, anger towards supervisors, and fears that he will "go off" on others. (Tr. 654.)

In December 2007, Joelle Larsen, Ph.D., a state agency psychologist, reviewed Powell's

record and completed a mental residual functional capacity ("RFC") assessment and psychiatric review technique. (Tr. 677-94.) She found Powell was moderately limited in his ability to understand, remember, and carry out detailed instruction; maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 677-79.) He was not significantly limited in the fourteen remaining categories. (Tr. 677-79.) Dr. Larsen found Powell not credible in regard to his self-reported drug and alcohol use because he claimed that he stopped using all substances in 1999, yet received diagnoses of cocaine and cannabis dependence as late as January 2007. (Tr. 679.) She assigned him a GAF of 50. (Tr. 679.) Dr. Larsen could not determine the extent of the underlying issues on functioning due to Powell's continued drug use. (Tr. 679.)

On the psychiatric review technique, Dr. Larsen found Powell had bipolar disorder; intermittent explosive disorder; cocaine dependence; cannabis dependence; and past substance-induced psychotic disorder. (Tr. 684-89.) Powell had a mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 691.)

On January 30, 2008, Ms. Judith Brunow, a clinician at Park Center, conducted an addiction assessment (countersigned by Vivian Hernandez, Ph.D.). (Tr. 699-703.) Powell stated that his drug of choice was cocaine, but he had not used it in the past five years. (Tr. 699.) Powell also stated that he had last used marijuana in December 2007, but when advised that he would have to provide a urine sample, admitted that he had smoked marijuana within the past

forty-eight hours and was using daily. (Tr. 699.) He stated that he did not intend to quit smoking marijuana because it helps him control his social anxieties in a manner his medications do not. (Tr. 699.) Powell was assigned a GAF of 35 and diagnoses of intermittent explosive disorder; bipolar I disorder most recent episode depressed, severe with psychotic features; cocaine dependence; cannabis dependence; and personality disorder NOS. (Tr. 700.)

In March and April 2008, Powell told Ms. Lothamer and her colleague that he was hearing voices in his head. (Tr. 767, 795-96.) In June 2008, Ms. Lothamer indicated in a report to Allen County Superior Court that Powell continued to show improvement, but progress is slow, and she would consider him unemployable at that time. (Tr. 793.) In April 2009, Sarah Wilson, a clinician at Park Center, filled out a recertification review (countersigned by Dr. Hernandez). (Tr. 813-17.) She assigned Powell a GAF of 35 and diagnoses of bipolar I disorder most recent episode depressed, severe with psychotic features; intermittent explosive disorder; cocaine dependence; cannabis dependence; and personality disorder NOS. (Tr. 813.) October 2009 and January 2010 recertification reviews contained identical findings. (Tr. 832-35, 1084-87.)

In November 2009, Ms. Lothamer completed a mental impairment questionnaire for Powell. (Tr. 836-40.) She assigned him a current GAF of 50 and a highest past-year GAF of 35; she indicated diagnoses of bipolar I, cocaine and cannabis dependence, and personality disorder NOS. (Tr. 836.) On the mental abilities and aptitude to perform unskilled work questionnaire, Ms. Lothamer found that Powell was unable to meet competitive standards in five of the sixteen categories and had no useful ability to function in nine of the sixteen categories. (Tr. 837-38.) On the mental abilities and aptitude to perform semi-skilled and skilled work questionnaire, Ms.

8

Lothamer found he had no useful ability to function in all four categories. (Tr. 838.) On the mental abilities and aptitude to do particular types of jobs questionnaire, Ms. Lothamer found Powell was unable to meet competitive standards in one of the five categories, and had no useful ability to function in three of the five categories. (Tr. 838.) In regard to functional limitation, Powell had marked limitations in activities of daily living and in maintaining concentration, persistence or pace; an extreme difficulty in maintaining social functioning; and three repeated episodes of decompensation within a twelve-month period, each of at least two weeks duration. (Tr. 839.) Finally, Ms. Lothamer opined that Powell's impairments would cause him to miss more than four days of work per month. (Tr. 840.)

In February 2010, Ms. Brunow performed an insight diagnostic evaluation. (Tr. 1062-68.) Powell acknowledged his addiction problem and his need to stay sober; he had been sober for a year except for a drink on New Year's and tested negative for all substances (except Opiates, but he had a prescription for Vicodin). (Tr. 1062.) He was currently on probation stemming from an attempted theft conviction in December 2008, and had been directed to get a drug and alcohol assessment because he was using cocaine on the day of the offense; Powell states that this was the first time he had used cocaine in a year. (Tr. 1064, 1066.) Powell stated that although he is less angry, he still has some difficulty with hearing voices. (Tr. 1063.)

On mental status exam, Powell worried excessively; was incoherent and delusional; and had poor judgment, repetitive speech, rigid thinking, loosening of thought, suspicious and blaming thought content, hallucinations, and a religious preoccupation. (Tr. 1064.) Powell was assigned a GAF of 35 and diagnoses of bipolar I disorder most recent episode depressed, severe with psychotic features; intermittent explosive disorder; cocaine dependence, in full sustained

remission; and personality disorder NOS. (Tr. 1067.)

In March 2011, Powell's girlfriend reported to Ms. Lothamer that Powell "goes off less," but stays to himself. (Tr. 1150.) On mental status exam, Powell had a depressed mood, detached attitude, distractible behavior, and flat affect. (Tr. 1150-52.) A May 2011 treatment plan indicated that Powell was maintaining well and stable, was attending therapy regularly with good interest and participation, and had improved anger management. (Tr. 1145-47.)

In June 2011, Judy Woodward, a clinician at Park Center, completed a psychiatric status report (countersigned by Dr. Hernandez). (Tr. 1125-31.) She assigned Powell a GAF of 51 and diagnoses of bipolar I disorder, most recent episode depressed, severe, with psychotic features; intermittent explosive disorder; cocaine dependence; cannabis dependence; and personality disorder NOS. (Tr. 1125.) Powell reported feeling helpless, hopeless, and worthless; was unable to focus and concentrate; had constantly heard voices for twenty years with no periods of remission; and could not trust himself around people because of his explosive tendencies. (Tr. 1127.)

In June 2011, Michael D. Scherbinksi, Ph.D., conducted a psychological evaluation at the request of Social Security. (Tr. 1133-38.) Powell's speech and attention were appropriate, but difficulties with concentration and slow mental processing were observed. (Tr. 1133.) In regard to ability to engage in gainful employment, Powell was able to communicate effectively, demonstrate appropriate social interaction skills, work to the best of his ability, and was compliant with all requests. (Tr. 1137.) Dr. Scherbinksi opined that Powell's ability would likely allow him to potentially gain and maintain employment, but due to his reported mental health concerns, he may have difficulty consistently meeting work demands. (Tr. 1137.) He

assigned Powell a GAF of 50 and diagnoses of schizophrenia, paranoid type (provisional); cocaine dependence, sustained full remission; and alcohol dependence, sustained full remission. (Tr. 1137.)

The next month, July 2011, Kari Kennedy, Psy.D, a state agency psychologist, reviewed Powell's record and concluded that he had a mild restriction of activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. 1181-97.) In an RFC assessment, Dr. Kennedy found that Powell was either moderately limited or not significantly limited in each of the twenty categories. (Tr. 1195-96.) She concluded that he was able to understand, carry out, and remember simple instructions; make judgments commensurate with functions of unskilled work; respond appropriately to brief supervision and interactions with coworkers; deal with changes in a routine work setting; may prefer to work in a position that requires minimal interaction with others and with a supportive, rather than critical, supervisor; and appears capable of unskilled work. (Tr. 1197.)

In April 2012, Ms. Lothamer completed a medical source statement (countersigned by Dr. Varma). (Tr. 1264-69.) She indicated that she saw Powell at a frequency consistent with the relevant accepted medical practice and identified his symptoms as decreased motivation, lack of focus and concentration, and hearing voices. (Tr. 1264.) Ms. Lothamer indicated that if Powell returned to full-time work, his mental functioning would worsen due to his agitation around others (Tr. 1265); thus, he would be limited to working alone or apart from others (Tr. 1267). She also found that without including any problems related to substance abuse, Powell would miss more than three days of work a month and have difficulty getting along with others due to his issues with agitation and motivation. (Tr. 1266-67.) She further opined that without

including any problems from substance abuse, Powell would have difficulty with attention and concentration in unskilled work and would stay on task only 70 to 75% of the workday; she attributed this limitation to his past substance abuse and his difficulty being around others. (Tr. 1266-67.)  When asked whether she thought Powell would still have the foregoing limitations despite any problems he has had with substance abuse, Ms. Lothamer stated that she was "not sure," because his "substance abuse occurred before [his] symptoms." (Tr. 1269.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# IV. ANALYSIS

## *A. The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On June 14, 2012, the ALJ rendered her decision. (Tr. 19-43.) She found at step one of the five-step analysis that Powell had not engaged in substantial gainful activity since the alleged onset date, and, at step two, that he had the following severe impairments: bipolar disorder, intermittent explosive disorder, personality disorder, cocaine dependence, cannabis dependence, osteoarthritis, hypogonadism, hyperlipidemia, ACL tear at the left knee, hypertension, disorders of the spine, obesity, and diabetes mellitus. (Tr. 22.) At step three, the ALJ determined that Powell's impairment or combination of impairments did not meet or medically equal a listing. (Tr. 23-25.) Before proceeding to step four, the ALJ determined that based on all of the impairments, including substance use disorders, Powell had the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work . . . with additional limitations. Claimant can lift and/or carry eight pounds frequently. Claimant can lift and/or carry ten pounds occasionally. Claimant can stand and/or walk two hours out of an eight-hour shift. Claimant can sit for six hours during the eight-hour work shift. Claimant can occasionally climb ramps or stairs, but can never climb ladders, ropes or scaffolds. Claimant can occasionally balance, stoop, kneel, crouch, and/or crawl. With respect to his work environment, he must avoid concentrated exposure to extreme cold and/or heat and hazards such as the operational control of moving machinery, unprotected heights, and slippery/uneven surfaces. Claimant needs to utilize a cane, but only when walking. The claimant can tolerate only superficial interactions with the public, supervisors, and co-workers. Based upon a moderate difficulty with concentration, claimant cannot understand, remember, or carry out detailed instructions or tolerate sudden or unpredictable workplace changes. He is unable to attend employment as scheduled, missing three or more days of work per month on a consistent basis.

(Tr. 25-26).

Moving to step four, the ALJ found that Powell was unable to perform his past relevant work. (Tr. 31.) Based on the RFC, the VE's testimony, and Powell's substance use disorders,

14

the ALJ then determined at step five that there are no jobs that exist in significant numbers in the national economy that Powell can perform. (Tr. 31.)

Because of Powell's substance use disorder, the ALJ then reevaluated Powell as to how he would perform if he stopped the substance use. (Tr. 32.) At step two, the ALJ found that absent his drug use, Powell had the following severe impairments: hypogonadism, hypertriglyceridemia, depression, gastroesophageal reflux disease, left knee osteoarthritis, disorders of the spine, diabetes mellitus, obesity, bipolar disorder, intermittent explosive disorder, cocaine dependence in remission, cannabis dependence in remission, personality disorder, and schizophrenia. (Tr. 32.) At step three, the ALJ determined that if Powell stopped the substance use, he would not have an impairment or combination of impairments that meets or medically equal a listing. (Tr. 33-34.) Before proceeding to step four, the ALJ determined that if Powell stopped the substance use, he would have the following RFC:

> [T]he claimant would have the residual functional capacity to perform sedentary work . . . with additional limitations. Claimant can lift and/or carry eight pounds frequently. Claimant can lift and/or carry ten pounds occasionally. Claimant can stand and/or walk two hours out of an eight-hour shift. Claimant can sit for six hours during the eight-hour work shift. Claimant can occasionally climb ramps or stairs, but can never climb ladders, ropes or scaffolds. Claimant can occasionally balance, stoop, kneel, crouch, and/or crawl. With respect to his work environment, he must avoid concentrated exposure to extreme cold and/or heat and hazards such as the operational control of moving machinery, unprotected heights, and slippery/uneven surfaces. Claimant needs to utilize a cane, but only when walking. The claimant can tolerate only superficial interactions with the public, supervisors, and co-workers. Based upon a moderate difficulty with concentration, claimant cannot understand, remember, or carry out detailed instructions or tolerate sudden or unpredictable workplace changes.

(Tr. 34.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that if Powell stopped the substance use, he would be unable to perform any of his past relevant work. (Tr. 42.)

The ALJ found at step five that if Powell stopped his substance use, there would be a significant number of jobs within the economy that he could perform, including addresser, surveillance monitor, and document copier or preparer. (Tr. 42.) The ALJ then concluded that Powell's substance use disorder is a contributing factor material to the determination of disability, and therefore, he has not been disabled within the meaning of the Act at any time from the alleged onset date through the date of the decision. (Tr. 42-43.) Accordingly, Powell's claims for DIB and SSI were denied. (Tr. 43.)

### C. The ALJ's Discounting of Ms. Lothamer's April 2012 Medical Source Statement Is Not Supported by Substantial Evidence

First, Powell argues that the ALJ improperly discounted the April 2012 medical source statement of Ms. Lothamer, his treating psychiatric nurse, which was countersigned by Dr. Varma. In the statement, Ms. Lothamer opined that even if Powell stopped using substances, his mental illness symptoms would worsen if he returned to full-time work, he would miss more than three days of work per month and have difficulty getting along with others, and he could remain on task only 70 to 75% of an eight-hour workday. (Tr. 1264-69.) The VE testified that an individual with these limitations could not maintain competitive employment. (Tr. 98-99.)

In discounting Ms. Lothamer's April 2012 opinion, the ALJ first stated: "Ms. Lothamer's opinion is not fully reliable because it inconsistently relates that she was unaware of drug use after 2007 and its impact on the claimant's functioning, which contradicts other notes that she made." (Tr. 30.) But the ALJ's assertion of internal inconsistency among Ms. Lothamer's notes is not borne out in the Court's review of the record, as Ms. Lothamer's documentation does not suggest that she was unaware Powell used drugs after 2007.

Rather, as the ALJ noted, Ms. Lothamer noted in February 2008 that Powell admitted to

16

daily cannabis use and that she strongly counseled him on the matter. (Tr. 29.)  Also, Ms.

Lothamer listed a diagnosis of cocaine and cannabis dependence on her November 2009 mental

impairment questionnaire. (Tr. 836.)  As a result, the Court cannot trace the ALJ's logic in

discounting Ms. Lothamer's opinion for the reason that she "inconsistently relate[d] that she was

unaware of [Powell's] drug use after 2007 . . . ." (Tr. 30); *see Clifford*, 227 F.3d at 872 ("[The

ALJ] must build an accurate and logical bridge from the evidence to his conclusions."); *Strobach

v. Colvin*, No. 12 cv 50012, 2014 WL 1388285, at *12 (N.D. Ill. Apr. 9, 2014) (remanding where

the ALJ's erred by discounting the nurse practitioner's opinion because of alleged

inconsistencies without detailing what inconsistencies existed in the record).  Nor does the

Commissioner assist the Court on this front, as she failed to respond to this argument. (*See* Mem.

in Supp. of the Commissioner's Decision 6-8.)

The ALJ also criticized Ms. Lothamer's statement in her April 2012 opinion that she was

unsure what impact Powell's substance abuse had on his mental health problems because his

"substance abuse occurred before [his mental health] symptoms." (Tr. 29 (quoting Tr. 1269).)  In

doing so, the ALJ emphasized that Ms. Lothamer had access to assessments in December 2006

and November 2007 that spoke to the impact of Powell's substance use and his limitations when

using cocaine. (Tr. 29 (citing Tr. 963-66, 971-74).)  The ALJ then explained that these

assessments reflected that Powell stole and sold his girlfriend's belongings to get money for

crack cocaine, smoked crack cocaine within the past thirty days, denied having a substance abuse

problem, and that his girlfriend reported he smoked crack every day. (Tr. 29.)

But the actions that the ALJ identified from the assessments–that Powell indeed had a

substance use problem–shed little light on whether Powell's drug use was material to his mental

health problems. "[T]he fact that substance abuse [may have] aggravated [the claimant's] mental illness does not prove that the mental illness itself is not disabling." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). Thus, the ALJ's logic is again difficult to trace with respect to his rejection of Ms. Lothamer's April 2012 medical source statement on this basis. *See Clifford*, 227 F.3d at 872.

And to the extent that Powell's substance abuse occurred before his mental illness symptoms as Ms. Lothamer represents, this is not necessarily determinative of disability. "[C]ourts have . . . found that an addiction may not be 'material' under the regulations even if it causes a claimant's disability." *Richardson v. Astrue*, No. 11 C 7080, 2013 WL 427125, at *8 (N.D. Ill. Jan. 11, 2013). Here, Ms. Lothamer specifically attributed Powell's decreased concentration, at least in part, to his *past* drug use. (Tr. 1266.) Thus, the Court fails to see how Ms. Lothamer's April 2012 opinion is inconsistent with the "other notes that she made." (Tr. 30.)

The ALJ was correct, however, to consider the April 2012 medical source statement as an opinion from Ms. Lothamer, rather than Dr. Varma. "Only an 'acceptable medical source' is considered a treating source," *Cooper v. Astrue*, No. 1:06-cv-1175, 2007 WL 2904069, at *3 (S.D. Ind. Sept. 27, 2007) (citing SSR 06-03p, 2006 WL 2329939), and Powell concedes that Ms. Lothamer is not an acceptable medical source under the applicable regulations. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (listing acceptable medical sources); SSR 06-03p, 2006 WL 2329939, at *2 (stating that nurse practitioners are not "acceptable medical sources"). Powell admits that "Dr. Varma did not examine [him] or meet with him clinically" (Opening Br. 20), and thus, the inquiry boils down to whether Dr. Varma's countersignature transformed the April 2012 medical source statement into a treating source opinion.

The answer to that inquiry, in short, is "no." The Seventh Circuit Court of Appeals has explained that a physician does *not* become a treating source simply because a nurse-practitioner fills out a form "in collaboration with a supervising doctor." *Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010) (unpublished) (concluding that where there is no evidence that the physician "ever examined [claimant]–let alone treated him[,]" he is not considered a treating source opinion); *see Elliot v. Colvin*, No. 1:13-cv-90, 2014 WL 1018053, at *3-4 (S.D. Ind. Mar. 17, 2014) (holding that physician's countersignature on a social worker's evaluation did not qualify it as treating source opinion where the physician never saw the claimant or consulted with the social worker in conducting the evaluation).

It appears that Ms. Lothamer's opinion "simply had to be countersigned by either a physician or psychologist, and therefore, [Dr. Varma] counter[]signed the document." *Elliot*, 2014 WL 1018053, at *3; *see Cooper v. Astrue*, No. 1:06-cv-1175, 2007 WL 2904069, at *3 (S.D. Ind. Sept. 27, 2007) (rejecting claimant's assertion to treat a nurse practitioner's opinion that was countersigned by a doctor as a treating source opinion where there was no evidence the doctor saw the claimant or consulted with the nurse about the assessment). "[D]espite the counter[]signature, the assessment is from [Ms. Lothamer], a nurse practitioner, and not an accepted medical source." *Cooper*, 2007 WL 2904069, at *3; *see also Elliot*, 2014 WL 1018063, at *3. As such, the ALJ was not required to give [Ms. Lothamer's] opinion any added or controlling weight." *Elliot*, 2014 WL 1018053, at *3 (citing SSR 06-03p); *accord Cooper*, 2007 WL 2904069, at *3.

But, significantly, the fact that Ms. Lothamer is an "other source" under the regulations "says nothing itself as to why [her opinion is] only entitled to little weight." *Hampton v. Colvin*,

No. 12 C 9300, 2013 WL 6577933, at *6 (N.D. Ill. Dec. 13, 2013) (remanding the case based on the ALJ's reasoning with respect to the nurse practitioners' opinions, recognizing that the role they played took on special significance because they provided a very large proportion of the claimant's care). "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." SSR 06-03p, 2006 WL 2329939, at *5. "As SSR 06-03p recognizes, the growing importance of managed care means that nurse practitioners play an increasingly large role in treating patients who would otherwise be seen by physicians or other acceptable medical sources." *Hampton*, 2013 WL 6577933, at *6.

Having found that the ALJ's foregoing reasons for rejecting Ms. Lothamer's April 2012 opinion lack the support of the record, the Court cannot affirm the ALJ's reasoning solely on the ALJ's remaining basis–that the opinion came from an "other source." *See Courtney v. Colvin*, No. 11-cv-176, 2014 WL 218219, at *5 (W.D. Wis. Jan. 21, 2014) ("[A]n ALJ may not reject a [nurse practitioner's] report *solely* because [nurse practitioners] are not considered acceptable medical sources." (emphasis in original)); *Frame v. Astrue*, No. 1:11-cv-01062, 2012 WL 3637583, at *9 (S.D. Ind. Aug. 21, 2012) (remanding case where the ALJ rejected the nurse practitioner's opinion on the sole basis that she was an "other source"); *Garcia v. Astrue*, No. 1:11-cv-165, 2012 WL 3137890, at *12 (N.D. Ind. Aug. 1, 2012) (remanding case where the ALJ articulated at the outset that the nurse practitioner's opinion was worthy of less weight and then upon evaluating the opinion, discounted it on at least one basis that was "suspect"). Accordingly, the ALJ's decision will be remanded for the purpose of reconsidering the April

2012 opinion of Powell's treating psychiatric nurse practitioner, Ms. Lothamer.

### D. Upon Remand, the ALJ Should Also Revisit the Foundation for His Step-Five Finding

Powell also argues that the ALJ's determination at step five is not supported by substantial evidence because the VE's testimony about the number of addresser, surveillance monitor, and document copier or preparer jobs upon which the ALJ relied, lack an adequate foundation. For the following reasons, the Court encourages the ALJ upon remand to revisit the foundation for his step-five finding.

As explained earlier, a plaintiff seeking DIB or SSI bears the burden of proof at steps one through four of the ALJ's sequential five-part inquiry, but the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At this final step, the Commissioner must establish that the plaintiff's RFC allows him to engage in work found in significant numbers in the national economy. *Liskowitz v. Astrue*, 559 F.3d 736, 742-43 (7th Cir. 2009); 20 C.F.R. §§ 404.1520(f), 404.1566, 416.920(f), 416.966. One way the Commissioner may carry this burden is through the use of vocational expert testimony, provided that such testimony is reliable. *See Liskowitz*, 559 F.3d at 743; *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

The Seventh Circuit has "recognized that the standards by which an expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Evidence." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). Yet, "because an ALJ's findings must be supported by substantial evidence, an ALJ may depend upon expert testimony only if the testimony is reliable." *Id.*; *Donahue*, 279 F.3d at 446 ("Evidence is not 'substantial' if vital

testimony has been conjured out of whole cloth.").

"If the basis of the vocational expert's conclusions *is* questioned at the hearing, . . . then the ALJ should make an inquiry (similar though not necessarily identical to that of [Federal] Rule [of Evidence] 702) to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446 (emphasis in original). "A vocational expert is 'free to give a bottom line,' but the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions." *McKinnie*, 368 F.3d at 911 (quoting *Donahue*, 279 F.3d at 446); *see Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) ("[T]he data underlying a VE's testimony must be available on demand to facilitate cross-examination and testing of the VE's reliability.").

Here, Powell's attorney on cross examination questioned the VE's methodology with respect to how she arrived at the number of addresser, surveillance monitor, and document copier or preparer jobs. (Tr. 103.) The VE testified that the source of her numbers was the Bureau of Labor Statistics, which publishes data in occupational categories. (Tr. 103.) She explained that these categories, however, do not "match up" with the Dictionary of Occupational Title ("DOT") numbers (Tr. 103), and therefore, she must extrapolate specific job numbers from the categories (Tr. 103-04). To her knowledge, there is no source that breaks down "every single DOT number and title" into the number of available jobs. (Tr. 104.) Thus, the DOT numbers and job titles she supplied were "representative of a larger occupational field" and contain "a number of DOT numbers[.]" (Tr. 103.) The job of addresser, for example, falls within the occupational category of mailing professions or office mailing professions. (Tr. 104.)

At that point, the ALJ took over the questioning of the VE:

Q    What resources do you use when you're coming up with your numbers? What things are you looking at?

A    I look at the information that is collected by the *Bureau of Labor Statistics*.

. . . .

Q    And you use that and is there anything else that you use to extrapolate your numbers, any other experience or references or anything that you use when you're coming up with your numbers?

A    I guess – what do you mean?

Q    Is the online stuff that you're looking at sufficient to provide the numbers that you need for your analysis or are there other things you take into consideration?

A    That and, you know, my experience working in the field and my training as a vocational expert, all of those things, combined, to come up with the numbers that we use.

Q    Okay.

(Tr. 104-06.)

Powell's attorney then resumed his cross-examination of the VE:

Q    So how did you use your experience and training to reach the addresser number, if you did?

A    Again, you know, that's information that we pull from that resource and then training that I receive, you know, in my work, working with people in the community, working with other vocational experts.

(Tr. 106.)

Thus, the VE, rather than producing data and reliable methodology in response to the questioning, testified that she essentially relied upon her own training and experience in reaching her bottom-line conclusions. The VE's training and experience, however, "does not explain her math." *Holtz v. Astrue*, No. 07-C-314-C, 2007 WL 5323758, at *5 (W.D. Wis. Nov. 8, 2007)

("*Holtz I*"); *accord Lawrence v. Astrue*, No. 07-cv-515, 2008 WL 3200747, at *6 (W.D. Wis. Aug. 2008); *see also Holtz v. Astrue*, No. 07-C-0314-C, 2008 WL 4704187, at *2 (W.D. Wis. Apr. 14, 2008) ("*Holtz II*") (articulating that the VE's experience was sufficient to support her testimony that cashier, electronics worker, and hand packager jobs existed in the state that could be performed at a lower level of exertion than called for in the DOT, "but it was not sufficient to support her conclusion about how many such jobs existed").

"[T]he case law in this Circuit is clear that once the basis of the VE's conclusions is questioned at the hearing, the ALJ's duty to make an inquiry into the reliability of those conclusions is triggered." *Rasnake v. Astrue*, No. 1:08-CV-134-PRC, 2009 WL 1085969, at *20 (N.D. Ind. Apr. 22, 2009) (citing *McKinnie*, 368 F.3d at 991; *Holtz I*, 2008 WL 4704187, at *1); *see Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008) ("[A] disability adjudication is a hybrid between the adversarial and inquisitorial models, and if the basis of the VE's testimony is questioned at the hearing, then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." (internal quotation marks and citations omitted)); *Polly v. Astrue*, No. 1:08-cv-158, 2009 WL 1766842, at *8 (N.D. Ind. June 23, 2009) (same).

As recited above, the ALJ did inquire into the reliability of the VE's testimony in response to Powell's attorney's cross-examination. But "[t]he inquiry itself . . . is without significant meaning if it is met with an inadequate response from the vocational expert." *Smith v. Astrue*, No. 09 C 2392, 2010 WL 3526655, at *17 (N.D. Ill. Sept. 1, 2010). Here, the VE "did not cite any formal market surveys that [s]he or other vocational experts had done or describe any informal method [s]he employed to extrapolate [her] estimates from the [Bureau of Labor] data." *Lawrence*, 2008 WL 3200747, at *6; *accord Holtz I*, 2007 WL 5323748, at *5; *cf. Hanson*

*v. Colvin*, No. 12-C-0822, 2013 WL 5273956, at *7 (W.D. Wis. Sept. 18, 2013) (finding the VE's testimony reliable where the VE, upon cross examination by the claimant's attorney, "*explained the method used to extrapolate from the [Bureau of Labor data]*, referenced the DOT and the Occupational Information Network, and cited her own knowledge and experience" (emphasis added)).  Here, the VE's rather "unsubstantiated and vague responses" cast doubt on the reliability of the foundation for her testimony. *Lawrence*, 2008 WL 3200747, at *6 (citing *McKinnie*, 368 F.3d at 911); *accord Holtz I*, 2007 WL 5323758, at *5.

The Commissioner bears the burden at step five, *Clifford*, 227 F.3d at 868, and thus the ALJ could have "delv[ed] deeper" into the VE's methodology once challenged by Powell's attorney. *Lacy v. Astrue*, No. 11 C 1556, 2012 WL 4759231, at *13 (N.D. Ill. Oct. 4, 2012) (stating that "the case law shows that the ALJ should have done more in an effort to vet the VE's reduction").  For example, further inquiry into the VE's experience in placing persons with similar limitations into the addresser, surveillance system monitor, and document copier jobs could shed light on how the VE went about extrapolating the number of jobs from the Bureau of Labor data in this instance, and in turn, whether the VE's extrapolations are a reliable foundation for the ALJ's determination that Powell is not disabled. *See id*.  Of course, "[a] finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Overman*, 546 F.3d at 464 (quoting *Britton*, 521 F.3d at 803).

For these reasons, the Commissioner upon remand is encouraged to revisit the foundation for the ALJ's step-five finding that Powell could perform a significant number of jobs in the

economy.[5]

<h1 style="text-align:center">V.  CONCLUSION</h1>

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and

the case is REMANDED for further proceedings in accordance with this Opinion.  The Clerk is

directed to enter a judgment in favor of Powell and against the Commissioner.

SO ORDERED.

Enter for this 22nd day of April, 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[5] Because a remand is warranted on the issues discussed herein, the Court does not need to reach Powell's remaining arguments.